**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1082**

SIERRA CLUB; VIRGINIA WILDERNESS COMMITTEE,

Petitioners,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK
SERVICE, an agency of the U.S. Department of the Interior; RYAN ZINKE,
in his official capacity as Secretary of the Department of the Interior;
MICHAEL T. REYNOLDS, in his official capacity as Deputy Director,
Operations, Exercising the Authority of Director; STAN AUSTIN, in his official
capacity as Southeast Regional Director, Responsible Official,

Respondents,

ATLANTIC COAST PIPELINE, LLC,

Intervenor.

On Petition for Review of a Decision of the National Park Service.  (5-140-1945)

**No. 18-1083**

DEFENDERS OF WILDLIFE; SIERRA CLUB; VIRGINIA WILDERNESS
COMMITTEE,

Petitioners,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of the Interior; RYAN ZINKE, in his official capacity as Secretary of the Department of the Interior; GREG SHEEHAN, in his official capacity as Principal Deputy Director; CINDY SCHULZ, in her official capacity as Field Supervisor, Virginia Ecological Services, Responsible Official,

Respondents,

ATLANTIC COAST PIPELINE, LLC,

Intervenor.

───────────────

On Petition for Review of a Decision of the United States Fish and Wildlife Service.
(CP15-554-000; CP15-554-001; CP15-555-000)

───────────────

Argued: May 10, 2018                                   Decided: August 6, 2018

───────────────

Before GREGORY, Chief Judge, WYNN and THACKER, Circuit Judges.

───────────────

Vacated by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Wynn and Judge Thacker joined.

───────────────

**ARGUED:** Austin Donald Gerken, Jr., SOUTHERN ENVIRONMENTAL LAW CENTER, Asheville, North Carolina, for Petitioners. Avi Kupfer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Brooks Meredith Smith, TROUTMAN SANDERS LLP, Richmond, Virginia, for Intervenor. **ON BRIEF:** Amelia Burnette, J. Patrick Hunter, Asheville, North Carolina, Gregory Buppert, SOUTHERN ENVIRONMENTAL LAW CENTER, Charlottesville, Virginia, for Petitioners. Eric Grant, Deputy Assistant Attorney General, Andrew Mergen, J. David Gunter II, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Andrew Tittler, S. Amanda Bossie, Office of the Solicitor, DEPARTMENT OF THE INTERIOR, Washington, D.C., for Respondents. Andrea W. Wortzel, TROUTMAN SANDERS LLP, Richmond, Virginia, for Intervenor.

GREGORY, Chief Judge:

These consolidated cases present two challenges to agency actions that provided necessary approvals for the Atlantic Coast Pipeline (ACP). The challenges were brought by Defenders of Wildlife, the Sierra Club, and the Virginia Wilderness Committee (collectively, "Petitioners"). For the reasons that follow, we conclude that both agency decisions are arbitrary and capricious.

The first petition, No. 18-1083, concerns the U.S. Fish and Wildlife Service (FWS). Pursuant to the Endangered Species Act, FWS issued an Incidental Take Statement (ITS) authorizing the pipeline to "take"—i.e., kill, harm, or harass—five species that are listed as threatened or endangered. Petitioners challenged the ITS as arbitrary and capricious under § 706 of the Administrative Procedure Act (APA) because the amount of take authorized in the ITS (known as the "take limit") cannot be enforced. Petitioners identify two flaws that make the take limits unenforceable: first, FWS failed to set numeric limits on take of the five threatened and endangered species, and second, FWS failed to comply with the requirements for using habitat as a surrogate for a numeric limit. Although FWS is not required to set a numeric limit, it can only use a habitat surrogate if it demonstrates a causal link between the species and the delineated habitat, shows that setting a numerical limit is not practical, and sets a clear standard for determining when incidental take is exceeded. Here, FWS failed some or all of these requirements for all five challenged species. As such, FWS's take limits are not enforceable and therefore arbitrary and capricious.

3

The second petition, No. 18-1082, concerns the U.S. National Park Service (NPS). The pipeline's proposed route intersects the Blue Ridge Parkway, a unit of the National Park System managed by NPS. Invoking the Blue Ridge Parkway Organic Act, NPS issued a right-of-way permit allowing the pipeline to drill and pass underneath the Parkway surface. The pipeline will also carve a path through a nearby forest, affecting views from the Parkway's scenic overlooks. Petitioners Sierra Club and the Virginia Wilderness Committee argue that NPS lacked the authority to grant a right-of-way to a gas pipeline and that doing so violated the statutory mandate that agency decisions not be inconsistent with the Parkway's conservation purpose. As detailed below, we assume for purposes of this case that NPS has the requisite statutory authority but because NPS does not explain how the pipeline crossing is not inconsistent with the purposes of the Parkway and the overall National Park System, the permit decision is arbitrary and capricious.

Part I of this opinion will provide a brief background and address a statute of limitations question common to both cases. Part II will provide the relevant background facts and legal analysis for No. 18-1083 (FWS), while Part III will provide the relevant background facts and legal analysis for No. 18-1082 (NPS). Finally, having concluded that the respective agencies erred, Part IV will address a question of remedy common to both cases.

4

## I.

## A.

The ACP is a 600-mile pipeline designed to transport natural gas from Harrison County, West Virginia, to the eastern portions of Virginia and North Carolina. J.A. 234. Constructing the pipeline would generally require a 125-foot right-of-way for most of the distance, which will disturb 11,776 acres of land. J.A. 553. Once completed, ACP would generally maintain a 50-foot permanent right-of-way along the length of the pipeline. J.A. 325.

Under the Natural Gas Act, the Federal Energy Regulatory Commission (FERC) is the agency responsible for giving final approval, in the form of a certificate of public convenience and necessity, for the construction of natural gas pipelines. 15 U.S.C. § 717f. The Natural Gas Act also requires applicants such as ACP to obtain "any permits, special use authorizations, certifications, opinions, or other approvals as may be required under Federal law." *N.Y. Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 452–53 (2d Cir. 2018). FERC serves as the "lead agency" responsible for "coordinating all applicable Federal authorizations." 15 U.S.C. § 717n.

On October 13, 2017, FERC issued ACP a certificate of public convenience and necessity that authorized the construction and operation of the pipeline. J.A. 234–389. As it has done in other cases, FERC conditioned its approval of the pipeline on ACP receiving all "state and other federal authorizations required for the proposed project." *Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*, 833 F.3d 360, 368 & n.5 (3d Cir. 2016); *see* J.A. 362–84 (listing conditions ACP must satisfy). Two of these

authorizations must come from FWS and NPS. On October 16, 2017, FWS issued a biological opinion and incidental take statement that authorized the pipeline to take several endangered and threatened species. On December 12, 2017, NPS issued a right-of-way permit authorizing the pipeline to cross the Blue Ridge Parkway. Petitioners challenged both agency actions in this Court on January 19, 2018.

B.

The first question we must resolve is whether the Petitioners filed their challenges within the applicable statute of limitations. Federal Rule of Appellate Procedure 15(a) provides that "[r]eview of an agency order is commenced by filing, *within the time prescribed by law*, a petition for review[.]" Fed. R. App. P. 15(a)(1) (emphasis added).

The Petitioners filed their challenges within 95 days (No. 18-1083) and 38 days (No. 18-1082) of the agency decisions, respectively. In their opening brief, Petitioners invoked the six-year statute of limitation created for claims "against the United States," which applies generally to challenges brought under the APA. *See* 28 U.S.C. § 2401(a); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999) (applying § 2401(a) to APA challenges).

ACP argues that these challenges were actually brought under the Natural Gas Act, 15 U.S.C. § 717r(d)(1), which lacks a statute of limitations. Thus, ACP urges us to adopt the most closely analogous *state law* statute of limitations. ACP Resp. Br. 18–27 (citing *Reed v. United Transp. Union*, 488 U.S. 319, 323–24 (1989); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 147 (1987); *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158–59 (1983)). ACP proposes the 30-day limitations period

applicable to petitions for review of state agency actions in West Virginia, Virginia, and North Carolina (the states through which the pipeline will be built). Such a short statute of limitations period, ACP argues, would comply with Congress's intent to create an expedited review process for agency decisions related to natural gas pipelines.

The problem with ACP's argument is that the cases on which it relies predate Congress's establishment of a four-year default statute of limitations for any "civil action arising under an Act of Congress enacted after" December 1, 1990. Judicial Improvements Act of 1990, Pub. L. No. 101–650, § 313, 104 Stat 5089, 5114–15 (codified at 28 U.S.C. § 1658(a)). This four-year default provision applies to any claim "made possible by a post-1990 enactment." *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). Congress specifically enacted § 1658(a) to "alleviat[e] the uncertainty inherent in the practice of borrowing state statutes of limitations." *Id.*

As Petitioners point out, Congress added 15 U.S.C. § 717r(d) in 2005. Energy Policy Act of 2005, Pub. L. No. 109-58, § 313(b), 119 Stat 594, 689–90. If § 717r(d) is the source of Petitioners' cause of action, then § 1658(a) applies and the statute of limitations is four years. The only other federal court to consider this issue also looked to § 1658(a) in declining to apply a more restrictive state limitations period. *Del. Riverkeeper Network v. Sec'y of Pa. Dep't of Envtl. Prot.*, 870 F.3d 171, 179 (3d Cir. 2017) (concluding that petitioner's challenge was timely under either § 1658(a) or the equitable doctrine of laches).

We need not decide whether the Natural Gas Act, which ACP cites as the cause of action, or the APA, which Petitioners cite as theirs, provides the applicable statute of

7

limitations.  Petitioners filed their challenges to FWS and NPS after 95 and 38 days, respectively.  By either measure, the petitions are timely.

## II.

We turn first to petition No. 18-1083, in which Petitioners challenge the take limits set by FWS for five species that will be negatively impacted by the pipeline.  We begin with the Endangered Species Act and the exception created for "incidental" take of threatened and endangered species.  We next discuss how the Endangered Species Act obligated FWS to analyze how the pipeline would affect threatened and endangered species.  We then summarize the statutory and regulatory requirements FWS must satisfy to issue a proper incidental take statement.  Finally, we review in detail the agency's determinations about the five species at issue.  We conclude that for each species, FWS failed to satisfy the requirements for a habitat surrogate and therefore failed to create enforceable take limits.

## A.

### 1.

Congress enacted the Endangered Species Act in 1973 "to protect and conserve endangered and threatened species and their habitats."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007).  In doing so, Congress made a "conscious decision . . . to give endangered species priority over the 'primary missions' of federal agencies."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).  Pursuant to Endangered

Species Act § 4, FWS determines what species are endangered or threatened[1] and designates their critical habitats. 16 U.S.C. § 1533; *see Nat'l Ass'n of Home Builders*, 551 U.S. at 651; 50 C.F.R. § 17.11 (listing endangered and threatened wildlife).

To protect threatened and endangered species, Endangered Species Act § 9 and FWS regulations prohibit their "take." 16 U.S.C. § 1538(a)(1)(B) (endangered species); 50 C.F.R. § 17.21(c) (endangered species); 50 C.F.R. § 17.31 (threatened species). To "take" a species is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 C.F.R. § 1532(19). Harm and harassment include the disruption of normal behavioral patterns and indirect injury caused by habitat modification. 50 C.F.R. § 17.3; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 702–04 (1995). "Any person" who knowingly takes an endangered or threatened species is "subject to substantial civil and criminal penalties, including imprisonment." *Bennett v. Spear*, 520 U.S. 154, 170 (1997); *see* 16 U.S.C. § 1540(a), (b).

In 1982, Congress created a narrow exception to the prohibition against take: when "such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B); *see* Endangered Species Act Amendments of 1982, Pub. L. No. 97-304, § 6, 96 Stat. 1411, 1422. To take a species under this exception, agencies such as FERC—or private entities taking species pursuant

---

[1] An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

to agency authority, such as ACP—must receive a valid Incidental Take Statement from FWS. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7), (i). The amount of take set by the ITS creates a "'trigger' that, when reached, results in an unacceptable level of incidental take." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1249 (9th Cir. 2001).

2.

Building a natural gas pipeline implicates a number of federal laws, including the Endangered Species Act. J.A. 545–52. Pursuant to Endangered Species Act § 7, FERC must ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of[2] any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). To satisfy this requirement, FERC must formally consult with FWS whenever a pipeline "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). FWS then provides FERC with a written statement (called a Biological Opinion) explaining "how the proposed action will affect the species or its habitat." *Bennett*, 520 U.S. at 158; *see* 16 U.S.C. § 1536(b)(3). If FWS concludes that the pipeline will adversely affect the species but "will not result in jeopardy or adverse habitat modification," then it must provide FERC with an ITS authorizing the anticipated

---

[2] "Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

10

incidental take and specifying the "impact of such incidental taking on the species." 16 U.S.C. § 1536(b)(4); *see Bennett*, 520 U.S. at 158.

In July 2017, FERC requested formal consultation with FWS about the ACP. J.A. 391. Three months later, FWS issued a Biological Opinion that addressed six threatened and endangered non-plant species: the Roanoke Logperch (a fish), the Clubshell (a mussel), the Rusty Patched Bumble Bee, the Madison Cave Isopod (a crustacean), the Indiana Bat, and the Northern Long-Eared Bat. J.A. 390–439. FWS concluded that the pipeline as a whole would not "jeopardize the continued existence of" the six species. J.A. 430–39. But because pipeline will adversely affect individuals from each species, FWS issued an ITS that set out the "amount or extent of take anticipated" by the ACP. J.A. 439–50.

Petitioners' sole challenge in this lawsuit is to the take limit set for five of the six species: the Clubshell, the Rusty Patched Bumble Bee, the Madison Cave Isopod, the Indiana Bat, and the Northern Long-Eared Bat.

B.

We have jurisdiction under the Natural Gas Act. 15 U.S.C. § 717r(d)(1). Because the Endangered Species Act does not specify a standard of review, "we apply the general standard of review of agency action established by" the APA. *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007). Under the APA, we "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Because "resolution of this dispute involves primarily issues of fact" and "requires a high

11

level of technical expertise," we must defer to "the informed discretion of the responsible federal agencies." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)). Nevertheless, we must conduct a "searching and careful" review to determine whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 378 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## C.

An ITS is a safe harbor: it allows an agency (here, FERC) to approve a project that takes threatened or endangered species without falling afoul of the Endangered Species Act. 50 C.F.R. § 402.14(i)(5); *see Bennett*, 520 U.S. at 170 ("Thus, the Biological Opinion's Incidental Take Statement constitutes a permit authorizing the action agency to 'take' the endangered or threatened species so long as it respects [FWS]'s 'terms and conditions.'"). "The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." *Bennett*, 520 U.S. at 170 (citing 16 U.S.C. § 1540(a), (b)).

For an ITS to function as a safe harbor, FWS must set an incidental take limit that can be monitored and enforced. FERC is required to "report the progress of the action and its impact on the species to [FWS] as specified in the incidental take statement." 50 C.F.R. § 402.14(i)(3). If the "amount or extent of incidental taking . . . is exceeded,"

12

FERC "must reinitiate consultation *immediately*." 50 C.F.R. § 402.14(i)(4) (emphasis added).

Section 7 of the Endangered Species Act requires an ITS to "[s]pecif[y] the impact, i.e., the amount or extent, of such incidental taking on the species." 50 C.F.R. § 402.14(i)(1)(i); *accord* 16 U.S.C. § 1536(b)(4). This impact—known as the incidental take limit—must set a "trigger" that can be monitored and enforced, else it is arbitrary and capricious. *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1275 (11th Cir. 2009); *accord Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1249; *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531–32 (9th Cir. 2010) (stating that FWS must set "triggers that can be monitored"). Both FWS and our sister circuits have recognized that Congress intended for this trigger to be a specific number whenever possible. *Interagency Cooperation–Endangered Species Act of 1973, as Amended; Incidental Take Statements*, 80 Fed. Reg. 26,832, 26,834 (May 11, 2015) (codified at 50 C.F.R. § 402.14(i)(1)(i)) (hereinafter "*Incidental Take Statements*") ("[FWS] acknowledge[s] congressional preference for expressing the impacts of take in incidental take statements in terms of a numerical limitation with respect to individuals of the listed species."); *Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1274–75 (citing H.R. Rep. No. 97–567, at 27 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 2807, 2827) ("Where possible, the impact should be specified in terms of a numerical limitation on the federal agency[.]")); *accord Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1249–50. An ITS "that 'contains no numerical cap on take and fails to explain why it does not' normally violates" the

13

Endangered Species Act. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1126–27 (9th Cir. 2012) (quoting *Allen*, 476 F.3d at 1037).

Here, FWS declined to set numeric limits on five of the six non-plant species that will be adversely affected by the pipeline. Instead, it set take limits as a "small percent," "majority" or "all" of the species within set geographic areas. As Petitioners point out, a "small percent" or a "majority" of a species is not an enforceable limit. FWS and ACP do not disagree. Instead, they claim that FWS used habitat surrogates.

A habitat surrogate is a way of defining take by the amount of adversely affected habitat rather than by the number of individuals harassed or killed. FWS has explained that habitat surrogates are "often more practical and meaningful to monitor project effects" because they can "provide a clear standard for determining when the amount or extent of anticipated take has been exceeded and consultation should be reinitiated." *Incidental Take Statements*, 80 Fed. Reg. at 26,839.

FWS regulations list three elements necessary for a proper habitat surrogate. First, FWS must include a description of "the causal link between the surrogate and take of the listed species." 50 C.F.R. § 402.14(i)(1)(i). A "causal link" is an "articulated, rational connection" between the activity and the taking of species. *See Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1250–51. FWS establishes a causal link by examining the habitat requirements and behavior of the listed species and determining the effect of the expected habitat modification. *Incidental Take Statements*, 80 Fed. Reg. at 26,834, 26,842. Examples of a causal link include "the number of burrows affected or a quantitative loss of cover, food, water quality, or symbionts." *Id.* at 26,834 (quoting U.S. Fish & Wildlife

14

Serv., *Procedures for Conducting Consultation and Conference Activities under § 7 of ESA* 4-47–48 (Mar. 1998) (hereinafter "*Endangered Species Consultation Handbook*")).

Second, FWS must explain "why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species." 50 C.F.R. § 402.14(i)(1)(i). There is no clear definition of what makes a numerical limit "not practical" (or not practicable), but FWS has indicated that the standard does not require impossibility. Instead, FWS has long encouraged the use of surrogates when the incidental take is "difficult to detect," which occurs "when the species is wide-ranging; has small body size; finding a dead or impaired specimen is unlikely; losses may be masked by seasonal fluctuations in numbers or other causes (e.g., oxygen depletions for aquatic species); or the species occurs in habitat (e.g., caves) that makes detection difficult." *Endangered Species Consultation Handbook* 4-52. FWS has also suggested that the cost of monitoring a species relative to the scope of the project can make a numeric limit impractical. *Incidental Take Statements*, 80 Fed. Reg. at 26,842. Nevertheless, our sister circuits have acknowledged Congress's preference for numerical limits where "possible" and found important FWS's ability to express take in numeric limits even when a species is difficult to detect. *E.g.*, *Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1274–75 (collecting cases); *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1249 (collecting cases).

Finally, FWS must set "a clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). A "clear standard" must be able to "adequately trigger reinitiation of consultation," *Allen*, 476 F.3d at 1038;

15

it cannot be "vague and undetectable criteria," *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1250–51 (internal quotation marks omitted). Nor can the standard be left to "the unfettered discretion of the Fish and Wildlife Service, leaving no method by which the applicant or the action agency can gauge their performance." *Id.* at 1250. FWS has endorsed habitat surrogates that are coextensive with a project's scope—i.e., the project can take all of the species within the bounds of the affected habitat—provided that the authorized agency (here, FERC) "monitor[s] project impacts to the surrogate during the course of the action . . . [to] determine whether these impacts are consistent with the analysis in the biological opinion." *Incidental Take Statements*, 80 Fed. Reg. at 26,834, 26,841–42.[3]

Turning to petition No. 18-1083, the only issue presented is whether FWS properly employed a habitat surrogate for five of the endangered and threatened species that will be adversely affected by the pipeline. Specifically, the Petitioners argue that: FWS did not establish that a numeric take limit was impractical, particularly because FWS had previously adopted numeric limits for some of the same species; FWS did not establish a causal link between the pipeline and the habitat selected for some of the species; and the surrogate limits adopted are unenforceable because they set the vague take limits of a "small percent" or a "majority" of individuals. *See* 50 C.F.R.

---

[3] Some eight years prior to this 2015 final rule, the Ninth Circuit expressed doubt about habitat surrogates that are coextensive with the project's own scope. *Allen*, 476 F.3d at 1039–40. Because Petitioners do not challenge the agency's determination, we assume without deciding that coextensive surrogates satisfy the Endangered Species Act.

§ 402.14(i)(1)(i). As explained in more detail below, we agree. Because our analysis differs for each of the five challenged species, we will discuss each one separately.

But first, we dispose of three overarching points. First, FWS claims that some numeric limits were not possible because either it lacked current survey information about many of the species or ACP had not completed the necessary surveys. This argument is "circular and unavailing." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1138 (N.D. Cal. 2006). FWS cannot escape its statutory and regulatory obligations by not obtaining accurate scientific information. *Id.*; *Allen*, 476 F.3d at 1037–38. Moreover, with one exception noted below, FWS "never states that it is not possible" to obtain or update the survey data and arrive at a numeric take limit. *Allen*, 476 F.3d at 1038. Instead, the agency only states that it and ACP have not actually done the surveys. *Id.* Thus, FWS's argument does not "establish the numerical measure's impracticality." *Id.*

Second, the agency argues that there was insufficient time for the agency or ACP to develop reliable survey information regarding certain of the species because the agency "must complete formal consultation on a short, ninety-day time timetable based on the 'best scientific and commercial data' *then* available." Gov't Br. 21 (citing 16 U.S.C. § 1536(a)(2)) (emphasis added). The agency incorrectly characterizes the law for at least two reasons. First, the statute does not require that the consultation be completed within 90 days. Rather, it states that the agency and FWS may extend the 90-day consultation period to and until 150 days without the consent of the applicant and even longer with the consent of the applicant. § 1536(b)(1)(A)–(B). Accordingly, Congress

expressly contemplated that FWS might need more than 90 days to conduct a review and provided a mechanism for it to do so. Second, contrary to the agency characterization, FWS is not required to rely on "'best scientific and commercial data' *then* available." Gov't Br. 21 (emphasis added). Rather, the statute requires that "each agency shall use the best scientific and commercial data available," § 1536(a)(2), regardless of whether the data is available at the time of the application. Accordingly, the statute does not foreclose FWS or an applicant from developing additional data. *See Allen*, 476 F.3d at 1038 (rejecting FWS determination that establishing numerical take limit was impractical due to lack of up-to-date surveys because agency never stated "that it is not possible to update the survey in order to estimate the number of takings, only that it has not actually done the surveys").

Tellingly, neither the statute, nor the agency's implementing regulation, nor the agency's *Endangered Species Consultation Handbook*, identify lack of time as a proper basis for concluding that setting a numerical limit is impractical. *See* H.R. Rep. No. 97-567, at 27 (1982) ("For example, it may not be possible to determine the number of eggs of an endangered or threatened fish which will be sucked into a power plant when water is used as a cooling mechanism."); *Incidental Take Statements*, 80 Fed. Reg. at 26,834 (stating that, "in many cases, the biology of the listed species or the nature of the proposed action makes it impractical to detect or monitor take of individuals of the listed species"); *id.* (providing as an example that calculating numerical take for pool fairy shrimp would be impractical because a single vernal pool "may contain thousands of individual shrimp as well as their eggs or cysts"); *Endangered Species Consultation*

18

*Handbook*, 4-52 (providing form ITS, which states "[The Wildlife Service] anticipates incidental take of (species) will be difficult to detect for the following reason(s): [Incidental take of actual species numbers may be difficult to detect when the species is wide-ranging; has small body size; finding a dead or impaired specimen is unlikely; losses may be masked by seasonal fluctuations in number or other causes (e.g., oxygen depletions for aquatic species); or the species occurs in a habitat (e.g. caves) that makes detection difficult.]"). Accordingly, we reject the agency's contention that lack of time is a proper basis for concluding establishing a numerical limit is impractical.

Third, although FWS and ACP both argue that the ITS passes muster, they cannot agree about what the ITS actually did. ACP claims that FWS set pure habitat surrogates; therefore, the "small percent" and "majority" language "was not meant to serve as a quantifiable limit on take" but instead "reflected FWS' position on the limited *effect* the authorized take was expected to have on the species." ACP Resp. Br. 43 (emphasis added); *see id* at 33–43, 47. FWS, by contrast, seems to interpret the ITS as setting both numeric and habitat take limits. Gov't Resp. Br. 29 ("Petitioners are correct that the ITS also estimates take for some of those species in terms of percentages of individuals[.]"); *id.* at 25–26 (defining take for Clubshell as one population); *id.* at 28 (stating that FWS allowed take of a "small percent" of Indiana Bats within a narrowly drawn area).

FWS and ACP cannot rewrite the ITS on appeal. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action."). Within a section titled "Amount or Extent of Take Anticipated," FWS prepared a table for each

19

species and stated that the reader should look to that table to locate the anticipated take limit. J.A. 440–43 (stating, for example, that the "anticipated take is described in Table 6 below" for the Clubshell). We review the plain language of the take limits as set forth by FWS in each table. *See State Farm*, 463 U.S. at 50. We also note that the inability of FWS and ACP to agree on exactly what level of incidental take is allowed only reinforces our conclusion that the ITS set vague and unenforceable limits.

### 1. Roanoke Logperch (*Percina rex*)

Before turning to the five challenged species, we take a moment to discuss briefly the sixth: the Roanoke Logperch, an endangered freshwater fish. Petitioners do not challenge the logperch take limit, but FWS's approach to the logperch is a useful comparator when evaluating its much different approach to the other five species.

The pipeline will cross four waterbodies known or with potential to support the logperch. J.A. 407. Neither ACP nor FWS conducted presence/absence surveys; instead, they assumed the presence of the logperch because the pipeline will affect potential habitat in areas known to support the logperch. J.A. 405. ACP threatens the logperch both indirectly due to increased sedimentation and directly where it crosses waterbodies with logperch present. J.A. 407, 418.

FWS estimated that a total of 150 logperch are expected to occur in the area affected by the pipeline. J.A. 406. It reached this number by using recent survey information for two of the four affected waterbodies. In the first waterbody, a 2017 survey observed 12 logperch. FWS multiplied that number by ten because "mark-recapture data indicates that only about 10% of [logperch] are actually detected during

20

surveys." This resulted in an estimated 120 total logperch. In the second waterbody, a 2012 survey observed one logperch. Adjusting by the same multiple of ten, FWS estimated there were ten total logperch there. The third and fourth waterbodies lacked recent survey information, but FWS believed the fish to be present at a density comparable to the second waterbody (i.e., 10). And 120 plus ten plus ten plus ten equals 150.

FWS set a take limit of 5 individual Roanoke Logperch through injury or death and 145 individuals through harm or harassment. J.A. 440. To arrive at this take limit, FWS divided the area of logperch habitat needed to actually build the crossing structures by the total area of logperch habitat at each pipeline crossing and determined that the crossings themselves will comprise 3.3 percent of the total affected habitat. Because FWS estimates that there are 150 logperch total in the area, this means 3.3 percent (or 5 logperch) will be directly killed by the crossings, while the other 145 will be harmed or harassed by increased sedimentation. *Id.* We note that FWS set a numeric take limit for the Roanoke Logperch despite using surveys from several years ago that observed only a few fish and despite the detection difficulties caused by the logperch's small size (five inches) and river habitat.

### 2. Clubshell (*Pleurobema clava*)

The Clubshell is an endangered mussel that grows to be about three inches long. J.A. 692. In the Monongahela River system of West Virginia, which contains only one Clubshell population in Hackers Creek, the Clubshell is in severe decline and is not reproducing. J.A. 401, 432. A 2009 survey at a long-term monitoring site in Hackers

Creek found 29 individuals; a 2014 survey found 19 individuals. J.A. 407. ACP will conduct construction in the upstream drainage area of Hackers Creek and will cross six of its tributaries. J.A. 407. The resulting sediment load will adversely impact the Clubshell population at Hackers Creek. J.A. 432.

FWS set the take limit as: killing a "[s]mall percent of individuals present within 585 m," and harming or harassing the "[m]ajority of individuals present within 585 m." J.A. 440–41. The agency explained that it "anticipates incidental take of clubshell will be difficult to detect for the following reason: up to 70% of a population can be distributed below the substrate surface." J.A. 440. Therefore, FWS concluded that the "level of take of this species can be anticipated by loss of habitat from 130 m downstream to 455 m upstream of Life's Run Bridge (County Route 14) (total of 585 m) because this area contains suitable clubshell habitat." J.A. 440. As part of the terms and conditions, FERC must collect all Clubshell in the 585-meter stretch of Hackers Creek. J.A. 444–45. The Clubshell will then be held at an approved facility for reintroduction after the pipeline is completed. *Id.*

The incidental take authorized here is not a proper habitat surrogate because it lacks the three necessary elements. First, there is no clear and enforceable standard of take. Instead, take is limited to a "small percent" and a "majority" of Clubshell within a fixed geographic area. Although the geographic bounds are fixed, FWS authorized the pipeline to take *only a subset of individuals located within those bounds*. But it is impossible to know the size of the subset—i.e., how many individuals constitute a "small percent" or a "majority."

22

Second, FWS offered no explanation for why the habitat surrogate is limited to 130 meters downstream and 455 meters upstream of Life's Run Bridge. Although the Biological Opinion mentioned that the Hackers Creek Clubshell population is located at Life's Run Bridge, the geographic bounds of 130 meters downstream and 455 meters upstream are not explained anywhere else in the ITS or Biological Opinion. The arbitrariness of this range is particularly conspicuous considering that the pipeline will introduce sediment upstream of Life's Run Bridge, meaning that the sediment will flow through all of Hackers Creek, not just 585 meters of it.

Finally, FWS did not adequately explain why a numeric limit is not practical. The only proffered explanation is that Clubshell are difficult to detect because most of them live below the substrate surface. But FWS has been able to adequately survey Clubshell in the past; indeed, it knew there were 29 Clubshell in 2009 and 19 in 2014. *See Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1275 (finding unpersuasive FWS's argument that a species was difficult to detect when the record showed the species being counted regularly). Moreover, the ITS terms and conditions require FERC to *remove and store* the Hackers Creek Clubshell during the pendency of construction, evincing a clear expectation that FERC can locate them. And in a prior ITS, FWS was able to set numeric take limits for the Clubshell. *Biological Opinion on the Washington Crossing Bridge Project* 22 (Sept. 2, 2014) (setting a total incidental take of 18 Clubshell).[4]

---

[4] We take judicial notice of this FWS record, which is also available on FWS's website. *See Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *Hall v. Virginia*, 385 F.3d 421, 424 & n.3 (4th Cir. 2004) (taking judicial notice of (Continued . . . )

In sum, the take limit for the Clubshell fails all three habitat surrogate requirements: it lacks a causal link between the specific 585-meter stretch of Hackers Creek and the local Clubshell population, it lacks an explanation as to why a numerical limit is impractical, and it lacks a clear enforcement standard. *See* 50 C.F.R. § 402.14(i)(1)(i). Because the ITS's Clubshell take limit is not a meaningful trigger, it violates the Endangered Species Act.

### 3. Rusty Patched Bumble Bee (*Bombus affinis*)

The Rusty Patched Bumble Bee (RPBB) was listed as endangered in January 2017. J.A. 401, 809–11. A 2017 survey found one bee in Bath County, Virginia, about a mile from the pipeline route. J.A. 408. FWS concluded that the magnitude of the Rusty Patched Bumble Bee's population losses "has greatly reduced the likelihood that the species is present elsewhere" along the pipeline route. J.A. 408. As a result, "comprehensive RPBB surveys were not conducted throughout the action area" in Virginia. J.A. 408.

Based on this single bee, FWS estimated that the Rusty Patched Bumble Bee is most likely to occur in a 653-hectare "high potential zone" near the pipeline. J.A. 408–

---

publicly available information on state government's website); U.S. Fish & Wildlife Serv., *Threatened & Endangered Biological Opinion (TEBO)* (Apr. 10, 2018), https://www.fws.gov/northeast/endangered/TEBO/tebo_%20index.html#G (saved as ECF opinion attachment 1). That FWS issued this Biological Opinion is not disputed. *See* Gov't Resp. Br. Mot. File Addendum 6, ECF No. 53.

When evaluating a challenged habitat surrogate, other courts have looked to FWS's ability to set numeric limits in other circumstances. *E.g.*, *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1138 (N.D. Cal. 2006) (noting that FWS had set numeric limits for the same species only two years prior).

24

10. The pipeline will directly affect approximately 7.3 hectares of this zone, which could "crush individuals, crush a colony, expose RPBBs to noise/vibration, and render habitat temporarily and permanently unsuitable." J.A. 421. After making a number of assumptions about bee and bee colony density, FWS estimated that one colony—i.e., a cohesive biological unit of bees established every spring by a solitary queen and made up of her offspring, J.A. 807—is statistically likely to be present in the 7.3 hectares directly affected by the pipeline. J.A. 433.

FWS set the take limit as: killing "1 colony present within 7.3 [hectares]" and harming or harassing a "[s]mall percent of [queen bees] from 1 colony present within 7.3 [hectares]." J.A. 441. FWS explained that it "anticipates incidental take of RPBB will be difficult to detect for the following reasons: species has small body size, losses may be masked by seasonal fluctuations in numbers and other environmental factors, and species occurs in habitat (i.e., underground) that makes detection difficult." J.A. 441.

The incidental take authorized here is not a proper habitat surrogate because it lacks two of the three necessary elements. FWS has demonstrated a causal link between the bee and the geographic boundaries of the take limit: the pipeline will affect 7.3 hectares of high potential habitat for the Rusty Patched Bumble Bee, which *statistically* will affect only one Rusty Patched Bumble Bee colony. But FWS's incidental take limit is not a clear standard because it is not actually defined by the 7.3 hectares; instead, take is limited to exactly *one colony and a small percent of queen bees within the 7.3 hectares*. Neither one colony nor a small percent is an enforceable standard: There may be multiple colonies within the 7.3 hectares, FERC cannot know if taken bees are from the

25

same colony or different colonies, and it is not clear what constitutes a "small percent" of queen bees. Moreover, FWS has not shown that a numeric limit is impractical.[5] It claimed that it has "no accurate way to assess the status of the local population," J.A. 409—but, only a few months earlier, FWS issued its own survey protocols for the Rusty Patched Bumble Bee, J.A. 854–89, and it had conducted a prior survey that identified the lone bee. *See Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1275. Indeed, FWS managed to set a numeric limit for the logperch in spite of a survey that located only one fish.

In sum, the take limit for the Rusty Patched Bumble Bee fails two of the habitat surrogate requirements: it lacks an explanation as to why a numerical limit is impractical, and it lacks a clear enforcement standard. *See* 50 C.F.R. § 402.14(i)(1)(i). Because the Rusty Patched Bumble Bee take limit is not a meaningful trigger, it violates the Endangered Species Act.

### 4. Madison Cave Isopod (*Antrolana lira*)

The Madison Cave Isopod (MCI) is a threatened subterranean freshwater crustacean about a half-inch in size. "The species is endemic to underground karst aquifer habitats and is restricted to the Shenandoah Valley, from Lexington, Virginia to Harpers Ferry, West Virginia." J.A. 608. The pipeline right of way, additional

---

[5] Because a colony is a biological unit founded by a single queen and can vary in size, "one colony" cannot function as an enforceable numeric limit. FWS concedes as much by arguing that it used a habitat surrogate for the Rusty Patched Bumble Bee, Gov't Resp. Br. 25–26, since habitat surrogates cannot be used unless a numeric limit is impractical.

26

temporary work space, and access roads will affect "approximately 1,974 surface acres (approximately 0.74%)" of the isopod's potential habitat in Augusta County, Virginia. J.A. 411. Included in this area are Cochran's Cave and five sinkholes, which FWS assumed are connected and which provide a conduit for sediment and contaminants to the isopod's habitat. J.A. 411–12. Because FWS lacked the ability to survey the presence or abundance of the isopods, it assumed that they will be found in the pipeline project area. J.A. 411.

The pipeline will threaten the isopods by crushing them or introducing sediment that smothers them or their habitat. J.A. 422. Although there are no "localities" in the pipeline construction area where Madison Cave Isopods have been sampled, FWS arbitrarily decided that Cochran's Cave would serve as an undocumented isopod "locality" and then chose to use "localities as a surrogate for a population." J.A. 434. It concluded that a total of 896.7 surface acres of isopod potential habitat is within 0.5 miles of the construction activities that bisect Cochran's Cave. J.A. 434. Within the 896.7 acres, the pipeline will directly displace 11.2 surface acres. J.A. 434. Within the rest of the 896.7 acres, ground-disturbing activities could smother or crush the isopods. J.A. 422.

FWS set the take limit as: killing a "[s]mall percent of individuals present within 11.2 acres" and harming or harassing "[a]ll individuals present within 896.7 acres." J.A. 441–42. The agency explained that "incidental take of the MCI will be difficult to detect for the following reasons: small body size, finding a dead or impaired specimen is

unlikely, and species occurs in habitat (underground) that makes detection difficult." J.A. 441.

FWS has shown that a numeric limit is not practical here: the isopod is a half-inch crustacean that lives in underground aquifers. But the take limit fails as a habitat surrogate because it lacks the other two elements. First, FWS stated that the pipeline will affect 1,974 surface acres of MCI potential habitat, all of which it assumes contains isopods. But without providing a reasoned explanation, FWS arbitrarily limited the habitat surrogate to the 896.7 acres near Cochran's Cave. Second, the proffered take limits are not real surrogates: the authorized take limit is (in part) *a "small percent" of isopods within the 11.2 acres that will be directly affected by the pipeline*. But there is no precise way of measuring what a "small percent" of isopods would be, and thus no clear standard for enforcement.

In sum, the take limit for the Madison Cave Isopod fails to satisfy two of the habitat surrogate requirements: its causal link between the isopod and the geographic bounds of the take limit is arbitrary, and it lacks a clear enforcement standard. *See* 50 C.F.R. § 402.14(i)(1)(i). Because the Madison Cave Isopod take limit is not a meaningful trigger, it violates the Endangered Species Act.

### 5. Indiana Bat (*Myolis sodalis*)

The Indiana Bat (Ibat) is an endangered migratory bat. FWS estimated that, as of 2017, there are only 425 in Virginia and 1,076 in West Virginia. J.A. 412. The pipeline crosses the Indiana Bat Appalachian Mountain Recovery Unit, an area of protected

Indiana Bat habitat that covers all of West Virginia and part of western Virginia.[6] J.A. 412, 725. The pipeline will adversely affect Indiana Bats by temporarily or permanently removing 4,448 acres of suitable habitat in the Recovery Unit. J.A. 423–24. Based on survey data and seasonal movements, FWS defined four relevant categories of Indiana Bat habitat in the Recovery Unit: (1) suitable unoccupied summer habitat, i.e., habitat that is unoccupied during the summer; (2) known use summer habitat, i.e., habitat that is known to be used by the bats in the summer; (3) unknown use spring staging/fall swarming habitat, i.e., habitat near unsurveyed but potentially suitable winter hibernation quarters (known as "hibernacula"); and (4) known use spring staging/fall swarming habitat, i.e., habitat near known hibernacula. J.A. 412. The pipeline will affect these different habitats in the Recovery Unit as follows:

| Habitat Category | Total (acres) |
|---|---|
| Suitable unoccupied summer habitat | 3,275.382 |
| Known use summer habitat | 144.1 |
| Unknown use spring staging/fall swarming habitat | 178.1 |
| Known use spring staging/fall swarming habitat | 850.4 |
| **Total Acres of Recovery Unit** | **4,447.982** |

J.A. 413.

FWS set the take limit as:

| Amount of Take Anticipated | Type of Take |
|---|---|
| Small percent of individuals present within 1,637.69 acres of suitable unoccupied summer habitat | Harm, Harass, Injure, or Kill |
| Small percent of individuals within 144.1 acres | Harass |

[6] U.S. Fish & Wildlife Serv., *Indiana Bat Range Map* (Mar. 12, 2018), https://www.fws.gov/midwest/endangered/mammals/inba/rangemapinba.html (saved as ECF opinion attachment 2).

29

| | |
|---|---|
| of known use summer habitat | |
| Small percent of individuals present within 89.05 acres of unknown use spring staging/fall swarming habitat | Harm, Harass, or Kill |
| Small percent of individuals present within 850.4 acres known use spring staging/fall swarming habitat | Harm, Harass, or Kill |

J.A. 442. The agency explained that it "anticipates incidental take of the Ibat will be difficult to detect for the following reasons: species has small body size, finding a dead or impaired specimen is unlikely, and species occurs in habitat (forest and caves) that makes detection difficult." J.A. 442. FWS concluded that the "take of this species can be anticipated by loss of 4,447.982 acres because this area contains suitable Ibat habitat." J.A. 442. But FWS imposed a 0.5 multiplier on the affected acreage for two of the four habitat categories—suitable unoccupied summer habitat and unknown use spring staging/fall swarming habitat—purportedly "[t]o account for differences in Ibat use of the habitat categories." J.A. 442.

The incidental take authorized here is not a proper habitat surrogate because it lacks the three necessary elements. First and most significantly, it is not a true habitat surrogate: take is limited to a "small percent" of Indiana Bats within each geographic area. Although the geographic bounds are fixed, the pipeline can *only take a subset of individuals located within those bounds*. But it is impossible to know what a "small percent" of bats is. Therefore, there is no clear and enforceable standard of take.

Second, two of the chosen geographic bounds are arbitrary. FWS knew that the pipeline will directly affect 3,275.382 acres of suitable unoccupied summer habitat and 178.1 acres of unknown use spring staging/fall swarming habitat. Yet, without any

explanation, the agency set the take limit for these two habitats at half of these acreages. In other words, FWS set the take limit at half the affected bat habitat that it knows the pipeline is going to affect. Even if FWS removed the words "small percent of individuals" from the take limit, the limit would still fail as a habitat surrogate because FWS knows that the pipeline will exceed the geographic bounds. Oddly, despite the ITS clearly showing the use of the 0.5 multiplier on two of the four habitats, both FWS and ACP claim that the habitat surrogate is actually the full 4,448 acres directly impacted by the pipeline. ACP Resp. Br. 40; Gov't Resp. Br. 27–28 & n.5. ACP actually seems unaware that FWS arbitrarily reduced the habitat surrogate to below the 4,448 affected acres. *Compare* ACP Resp. Br. 40 (stating that the habitat surrogate is 4,448 acres), *with* ACP Resp. Br. 46 (stating that the habitat surrogate applies to "individuals present within 1,637.69 acres of suitable unoccupied habitat, 144.1 acres of known use summer habitat, 89.05 acres of unknown use spring staging / fall swarming habitat and 850.4 acres of known use spring staging / fall swarming habitat"—even though these four numbers add up only to 2721.24 acres).

Finally, FWS has not shown that a numeric limit is impractical. The bats may be small, but FWS has been able to survey them in the past. Indeed, FWS made precise estimates as recently as 2017, determining that there are 425 bats in Virginia and 1,076 in West Virginia. *See Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1275. Moreover, FWS has previously issued incidental take statements with numeric limits for the Indiana Bat, even while recognizing that the bat is difficult to detect. *Update to the Biological Opinion on the 2014 Revision of the George Washington National Forest Land and*

*Resources Management Plan* 2 (April 21, 2014) (setting an "incidental take of up to 7 Indiana bats on an annual basis as the result of oil and gas leasing, prescribed fire, timber harvest, salvage activities, wildlife habitat management, and special use activities"); *Biological Opinion on Enbridge Pipelines (FSP) LLC's Flanagan South Pipeline Project* 64–65 (July 24, 2013) (setting incidental take of 19 Indiana bats and 120 reproductive female Indiana bats; noting that take will be measured by "observing mortality or injury" and by "the number of active maternity roost trees removed"); *Biological Opinion on the 2003 Revision of the Jefferson National Forest Land and Resource Management Plan* 33–34 (Jan. 13, 2004) (noting that the incidental take of the Indiana Bat in the Jefferson National Forest will be difficult to quantify and detect, but nevertheless estimating "there may be up to 10 Indiana bats on the [Forest] incidentally taken on an annual basis through actions that kill, harm, or harass").[7]

In sum, the take limit for the Indiana Bat fails all three habitat surrogate requirements: its causal link between the Indiana bat and the geographic bounds of the take limit is arbitrary, it lacks an explanation as to why a numerical limit is impractical,

---

[7] As explained in note 4, *supra*, we also take judicial notice of these FWS records, two of which are available on FWS's website. *See Goldfarb*, 791 F.3d at 508; *Hall*, 385 F.3d at 424 & n.3 (taking judicial notice of publicly available information on state government's website); U.S. Fish & Wildlife Serv., *Threatened & Endangered Biological Opinion (TEBO)* (Apr. 10, 2018), https://www.fws.gov/northeast/endangered/TEBO/tebo_%20index.html (saved as ECF opinion attachment 1); U.S. Fish & Wildlife Serv., *Midwest Region Biological Opinions* (June 11, 2018), https://www.fws.gov/midwest/endangered/section7/r3bo.html (saved as ECF opinion attachment 3). That FWS issued these Biological Opinions is not disputed. *See* Gov't Resp. Br. Mot. File Addendum 6, ECF No. 53.

and it lacks a clear enforcement standard. *See* 50 C.F.R. § 402.14(i)(1)(i). Because the Indiana Bat take limit is not a meaningful trigger, it violates the Endangered Species Act.

6. Northern Long-Eared Bat (*Myolis septentrionalts*)

The Northern Long-Eared Bat (NLEB) is a threatened migratory bat. Pipeline construction will remove 171 acres of trees within five miles of a Northern Long-Eared Bat hibernaculum identified as PH-S018. J.A. 425. In 2016, FWS promulgated a generally applicable final rule that governs most incidental take of the Northern Long-Eared Bat. *Endangered and Threatened Wildlife and Plants; 4(d) Rule for the Northern Long-Eared Bat*, 81 Fed. Reg. 1900 (Jan. 14, 2016) (codified at 50 C.F.R. § 17.40). Pursuant to this rule, ACP can conduct incidental take of the bat anywhere more than 0.25 miles away from hibernaculum PH-S018. J.A. 442. In the ITS at issue here, FWS addressed only the incidental take that will occur within a quarter mile of hibernaculum PH-S018. ACP will affect 0.4 acres of that quarter-mile radius, adversely impacting the Northern Long-Eared Bat's ability to forage for food and roost and rendering the habitat permanently unsuitable. J.A. 425, 443.

FWS set the take limit as: harming or harassing a "[s]mall percent of individuals present within 0.4 acres." J.A. 443. The agency explained that "incidental take of NLEB will be difficult to detect for the following reasons: species has small body size, finding a dead or impaired specimen is unlikely, and species occurs in habitat (forest and caves) that makes detection difficult." J.A. 443.

The incidental take authorized here is not a proper habitat surrogate because it lacks two of the three necessary elements. We find that FWS has demonstrated a causal

link between the Northern Long-Eared Bat and the 0.4 acres listed in the take limit. But, as with the other species, the take limit is not a true habitat surrogate: take is limited to a "small percent" of Northern Long-Eared Bats within the 0.4 acres. Although the geographic bounds are fixed, the pipeline can *only take a subset of individuals located within those bounds*. And it is impossible to know how many bats constitute a "small percent." Therefore, there is no clear and enforceable standard of take. Moreover, FWS has not shown that a numeric take limit is impractical in such a small geographic area.

In sum, the take limit for the Northern Long-Eared Bat fails two of the habitat surrogate requirements: it lacks an explanation as to why a numerical limit is impractical, and it lacks a clear enforcement standard. *See* 50 C.F.R. § 402.14(i)(1)(i). Because the Northern Long-Eared Bat take limit is not a meaningful trigger, it violates the Endangered Species Act.

\* \* \*

We find that FWS has failed to create proper habitat surrogates, failed to explain why numeric limits are not practical, and failed to create enforceable take limits for the Clubshell, the Rusty Patched Bumble Bee, the Madison Cave Isopod, the Indiana Bat, and the Northern Long-Eared Bat. Because FWS's vague and unenforceable take limits are arbitrary and capricious, we vacated the ITS pending the issuance of this opinion. *Sierra Club v. United States Dep't of the Interior*, 722 F. App'x 321, 322 (4th Cir. 2018).

III.

34

We next address petition No. 18-1082, which challenges the National Park Service (NPS)'s decision to issue a permit allowing the ACP to cross the Blue Ridge Parkway. Petitioners Sierra Club and Virginia Wilderness Committee[8] argue that granting a right-of-way to a gas pipeline exceeds NPS's statutory authority. They also argue that the ACP permit violates a statutory requirement that all agency authorizations be consistent with parkway purposes. NPS challenges Petitioners' standing to bring this petition, while both NPS and ACP contest the merits. We begin by briefly reciting the facts relevant to this petition before turning first to standing and next the merits.

A.

The Blue Ridge Parkway is a component of the National Park System, linking the Shenandoah National Park in Virginia to the Great Smoky Mountains National Park in North Carolina. 16 U.S.C. § 460a-2. Like the rest of the National Park System, the Parkway is managed by NPS. According to NPS's Management Plan, the Blue Ridge Parkway serves not only as a connector between destinations but also as a recreational and scenic site in itself. J.A. 623–24.

The ACP's proposed pathway intersects with the Blue Ridge Parkway. Accordingly, FERC's final approval of the pipeline hinges on NPS granting a right-of-way to cross the Parkway. As proposed, the pipeline would drill and pass underneath the Parkway without breaching the Parkway's surface. However, the proposed route would

---

[8] The Defenders of Wildlife is a petitioner in only No. 18-1083. For purposes of this section, we use "Petitioners" to refer to the Sierra Club and the Virginia Wilderness Committee.

require removing all of the trees from a portion of a nearby forest, leaving a vertical clearing that would be visible from the Parkway. J.A. 1018. During initial construction of the pipeline, that clearing would be 125 feet wide. Once construction is complete, the clearing would be reduced to a permanent 50-foot wide corridor, reserved for pipeline maintenance purposes. J.A. 325, 1035.

A visual impact study conducted by ACP and overseen by NPS concluded that the corridor would be visible from at least one key observation point along the Parkway, thus significantly decreasing the park's scenic value. J.A. 1020. Specifically, the analysis concluded that "[v]iews of the ACP corridor from the Three Ridges overlook . . . would likely be inconsistent with NPS management objectives, given the proximity to the viewer, the axial nature of the view, and the corridor's contrast with the surrounding forest." J.A. 1020.

On December 12, 2017, NPS issued a revocable permit granting right-of-way to ACP, subject to a list of terms and conditions. The permit cites only 16 U.S.C. § 460a-8 for its statutory authority. J.A. 897. The permit decision does not reference any harm to the Parkway's scenic or conservation value or the effectiveness of any mitigation strategies.

Petitioners now seek review of the right-of-way permit, arguing that NPS failed to comply with the Mineral Leasing Act and the Blue Ridge Parkway Organic Act. 30 U.S.C. § 185; 16 U.S.C. §§ 460a-3, 460a-3.

B.

36

We first address standing. Petitioners Sierra Club and the Virginia Wilderness Committee are organizational plaintiffs that have associational standing to sue "on behalf of [their] members when [their] members would otherwise have standing to sue in their own right."[9] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). For the members to establish standing, they, like all plaintiffs, "must show (1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). For the reasons below, we conclude that Petitioners (via their members) have met the requirements of Article III standing.

Members of the petitioning environmental groups aver that they regularly use and enjoy the Blue Ridge Parkway and its scenic views. Petitioners Opening Brief Addendum (Pet. Add.) 115, 126, 130, 171. One member avers that she and her husband have enjoyed using the Three Ridges Overlook for the past thirty-five years. Pet. Add. 117. Other members similarly affirm in their affidavits that they have been to Three Ridges in the past and intend to visit it regularly as part of their hikes and drives in the

_____

[9] Associational standing also requires that "the interests at stake [be] germane to the organization's purpose, and [and that] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw Envtl. Servs.*, 528 U.S. at 180–81. These elements of standing are not contested; it is clear that environmental preservation is germane to Petitioners' organization purpose and that individual participation by their members is unnecessary.

future because it is a particularly beautiful and cherished section of the Parkway. Pet. Add. 131, 167, 173. One of the members also owns a home near the Parkway, near where the construction is expected to occur. He expresses concerns about not only the pipeline's impact on the scenery he enjoys but also the noise and pollution expected to be caused by the drilling operation, which may affect his home. Pet. Add. 161–62, 164.

The affidavits provided by Petitioners' members sufficiently demonstrate injury in fact. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw Envtl. Servs.*, 528 U.S. at 183 (internal quotation marks and citation omitted). Here, the affidavits establish the members' longstanding history of enjoying not just the Blue Ridge Parkway generally but the Three Ridges Overlook specifically. The pipeline's construction and maintenance corridor would be visible from the Overlook and lessen the aesthetic value of the Parkway. Because the pipeline would prevent the members from enjoying the full beauty of the Parkway and the Overlook, they have established injury in fact.

Petitioners have also shown that their members' injuries are fairly traceable to, or caused by, NPS's right-of-way decision. To establish traceability, Petitioners' members must show that the challenged action is "in part responsible for frustrating" their ability to enjoy the Blue Ridge Parkway. *See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013). Here, NPS authorized the pipeline to cross the Blue Ridge Parkway near the Three Ridges Overlook. That crossing then created the need for the nearby construction and maintenance corridor that would diminish the Parkway's scenic value.

In other words, NPS enabled and virtually ensured the alleged harm to the Parkway's aesthetic value.

To the contrary, NPS argues that the alleged injuries are not directly caused by the segment of the pipeline that crosses the Parkway. Specifically, NPS emphasizes that the pipeline proceeds underneath the Parkway and does not disturb the Parkway's surface as it crosses. And, although the pipeline's construction and maintenance corridor will scar a nearby forest visible from the Parkway, NPS disclaims all responsibility because that corridor resides on federal lands not managed by NPS and does not require NPS authorization.[10] The problem with this argument is that the causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury. *See Bennett*, 520 U.S. at 168–69 ("This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."); *Libertarian Party of Va.*, 718 F.3d at 315–16. Here, without NPS's grant of a right-of-way, the pipeline could not have been authorized in its currently proposed form. It therefore cannot be said that Petitioners' injuries are "the result of the independent action of some third party not before the court." *See Bennett*, 520 U.S. at 168–69 (citation omitted) (holding that injuries were fairly traceable to Fish and Wildlife Service's biological opinion even though another agency had to decide how to proceed in

---

[10] We find it remarkable that counsel representing the National Park Service, which is charged with "provid[ing] for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations," would seem to take a litigation position that regards the premier conservation agency's role as no more than highway maintenance. *See* 54 U.S.C. § 100101.

light of biological opinion); *see also Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264–65 (1991) (finding standing to challenge constitutionality of Board of Review's veto power over agency's air traffic plan even though injuries were directly caused by agency's proposed plan and not Board's veto power). We accordingly reject NPS's efforts to elevate Petitioners' burden of proving causation and conclude that the alleged injuries are fairly traceable to the agency.

Finally, and for similar reasons, Petitioners have demonstrated redressability. To satisfy this element of standing, Petitioners must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw Envtl. Servs.*, 528 U.S. at 181. Petitioners "need not show that a favorable decision will relieve [their] every injury." *Larson v. Valente*, 456 U.S. 228, 242–44 & n.15 (1982). Instead, Petitioners need only show that they "personally would benefit in a tangible way from the court's intervention." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000) (en banc) (citation omitted). In this case, if this Court were to invalidate the NPS permit as requested, the pipeline cannot exist in its proposed form with its current authorizations and would have to be re-authorized with a new permit or possibly a new route to proceed.[11] *See* 15 U.S.C. §§ 717f, 717n; *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013) ("Before a company may construct a facility that transports natural gas, it must obtain from FERC a certificate

---

[11] As noted previously, FERC's authorization for ACP to begin construction is conditioned on the existence of valid authorizations from both FWS and NPS. Absent such authorizations, ACP, should it continue to proceed with construction, would violate FERC's certificate of public convenience and necessity. *See* J.A. 362–84.

of public convenience and necessity, and comply with all other federal, state, and local regulations not preempted by the NGA." (citation omitted)). Absent the pipeline crossing, there would be no associated construction and maintenance corridor nearby to interfere with the recreational use of the Parkway and the Overlook. *See Metro. Wash.*, 501 U.S. at 264–65 (holding that injuries were redressable because relief would stop implementation of air traffic plan expected to cause noise and pollution). Thus, Petitioners' injuries are redressable because granting the requested relief would at least mitigate, if not eliminate, the alleged harm.

NPS nonetheless argues that the pipeline might be re-routed in a way that remains close to the Blue Ridge Parkway such that it could still disrupt views from the Parkway without intersecting it. However, this argument is mere speculation. NPS has not provided any support for its claim that the pipeline would materially affect views from the Parkway even if ACP were denied a right-of-way. The crossing of the Parkway necessitated the maintenance corridor that harms views from the Parkway, and we simply see no reason why the pipeline would clear and maintain a permanent corridor near the Parkway if no crossing is (or can be) permitted by NPS. Just as Petitioners cannot establish redressability via speculation, NPS cannot simply hypothesize as to possible future harm to overcome the fact that a favorable ruling would redress Petitioners' only injury at this time.

Even assuming that such a re-routing were possible or even likely, NPS's argument still fails. The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability. *See Larson*, 456 U.S. at

41

242–43 (holding that plaintiffs had standing to challenge one part of state law requiring registration of charitable organizations, even if plaintiffs might ultimately be required to register under another provision). Moreover, an opportunity to enjoy the unadulterated views of the Parkway and the Overlook, even if only temporarily until a new route or permit is authorized, is itself a "tangible" benefit. *See Gaston Copper Recycling Corp.*, 204 F.3d at 162.

In sum, Petitioners have shown that their members will suffer an injury in fact that is at least partly caused by NPS's actions and that is likely to be redressed by a favorable ruling. Because their members have shown that they would have standing in their own right, Petitioners have associational standing to bring this suit.

## C.

We now turn to the merits of the petition, which presents two lines of argument against NPS's issuance of the right-of-way permit. First, Petitioners argue that NPS lacks general statutory authority to grant rights-of-way for oil and gas pipelines. Second, assuming such general authority exists, they argue that issuing the permit in this case violates the authorizing statute because it is not consistent with parkway purposes. Answering these questions requires us to interpret three statutory provisions—the two general right-of-way provisions under the Blue Ridge Parkway Organic Act and the definitional provision of the Mineral Leasing Act, which purportedly constrains agency authority under the Organic Act. We first consider what deference we owe to the agency's interpretation of these statutes and then address the parties' arguments.

## 1.

The parties seem to assume, without any analysis, that NPS's interpretation of the relevant statutes is eligible for *Chevron* review. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). However, as our sister circuits have held, parties "cannot waive the proper standard of review by failing to argue it." *See U.S. v. Freeman*, 640 F.3d 180, 186 (6th Cir. 2011) (internal quotation marks omitted); *accord Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001) ("[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived."); *Am. Soc. of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569 (2d Cir. 1990) (rejecting appellant's and appellee's proposed standard of review). Nor can parties "determine this court's standard of review by agreement." *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996). We therefore must independently assure ourselves that any statutory interpretation provided by NPS qualifies for *Chevron* review and if not, whether it is entitled to a lesser form of deference, such as that afforded under *Skidmore*. *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (discussing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) (Kennedy, J., concurring) (cautioning courts against abdication of judicial role by engaging in "reflexive deference" to agency decisions). For the reasons below, we conclude that the agency's statutory interpretation is not entitled to *Chevron* deference or *Skidmore* respect.

As the Supreme Court held in *Mead*, only an agency interpretation that carries the force of law is *Chevron*-eligible. 533 U.S. at 226–27 (holding that Customs' ruling letter classifying day-planners as "diaries" for tariff purposes does not carry force of law). An

43

agency interpretation carries force of law when, first, Congress has "delegated authority to the agency generally to make rules" and, second, the "agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.*

This case concerns the scope of authority granted by 16 U.S.C. § 460a-3 and § 460a-8 and the effect, if any, of the Mineral Leasing Act, 30 U.S.C. § 185, on those two provisions. But NPS, in its permit decision, interpreted only one of these provisions: § 460a-8. The permit does not even cite, let alone interpret, 16 U.S.C. § 460a-3 and 30 U.S.C. § 185. Thus, as to those two provisions, there is simply no agency interpretation that can claim deference, under *Chevron* or otherwise.[12] Meanwhile, the arguments that NPS's appellate counsel has marshalled in the agency's defense are merely litigation positions that do not reflect an exercise of delegated legislative authority and agency expertise and are not eligible for any deference. *See Knox Creek Coal Corp. v. Sec'y of Labor, Mine Safety & Health Admin.*, 811 F.3d 148, 159 (4th Cir. 2016); *see also Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008) ("We do not afford *Chevron* or *Skidmore* deference to litigation positions unmoored from any official agency interpretation because 'Congress has delegated to the administrative official and not to

---

[12] As to the Mineral Leasing Act in particular, this Court also would not defer to any NPS interpretation because NPS is not the agency charged with implementing the statute. *See* 30 U.S.C. § 185; *see King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (holding that Congress did not delegate health insurance policy to Internal Revenue Service); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (holding that statute did not delegate authority to Attorney General to make medical judgments); *Soliman v. Gonzales*, 419 F.3d 276, 281 (4th Cir. 2005) (holding that federal agency's interpretation of state law was not entitled to deference). Indeed, the National Park System is expressly excluded from the coverage of the Mineral Leasing Act.

appellate counsel the responsibility for elaborating and enforcing statutory commands.'" (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988))).

We now turn to the only relevant interpretation that NPS has rendered—its invocation of 16 U.S.C. § 460a-8. In its permit decision, NPS concluded that "§ 460a-8 authorizes the Secretary of the Interior to grant revocable licenses or permits for rights-of-way over, across, and upon Parkway lands, under such terms and conditions as he may determine to be consistent with the use of such lands for parkway purposes." J.A. 897. This near-verbatim recitation of § 460a-8 is not accompanied by any explanation or rationale. Nor does the boilerplate language specifically address authorizations concerning natural gas pipelines, the focus of this case.

Applying *Mead* to NPS's interpretation of § 460a-8, the first consideration is whether Congress has delegated power to the agency to make legislative-type determinations. *See A.T. Massey Coal Co. v. Holland*, 472 F.3d 148, 166 (4th Cir. 2006); *see also Mead*, 533 U.S. at 232–33. Section 460a-8 does not expressly delegate to the agency any rulemaking or formal adjudicatory power and appears to contemplate case-by-case determinations of applications for rights-of-way. *See* 16 U.S.C. § 460a-8. However, the absence of an explicit delegation is not conclusive and, at this juncture, we need not decide whether § 460a-8 implicitly confers on the agency the power to "stand[] in the shoes of Congress." *See A.T. Massey*, 472 F.3d at 166. We leave this delegation question for another day because the right-of-way permit clearly fails *Mead*'s second inquiry.

Even assuming that Congress has delegated interpretative power to NPS, *Mead* requires that the agency actually exercise that delegated authority before it can receive deference for its interpretation. *A.T. Massey*, 472 F.3d at 166. To determine whether an agency has exercised its power to make legislative-type determinations, we look for procedural hallmarks of legislative decision-making. *Id.* at 166–67. At minimum, agency decisions must have future application to claim rulemaking power. *See, e.g.*, *Knox Creek*, 811 F.3d at 159; *Martinez v. Holder*, 740 F.3d 902, 909–10 (4th Cir. 2014) (collecting cases); *Carpio v. Holder*, 592 F.3d 1091, 1097 (10th Cir. 2010) ("When, as here, the agency's interpretation was issued in an adjudication, we must consider whether the decision constitutes binding precedent within the agency."). Thus, agency decisions that are not precedential and binding within the agency itself generally do not qualify for *Chevron*.[13] *See Olson v. Fed. Mine Safety & Health Review Comm'n*, 381 F.3d 1007, 1014 (10th Cir. 2004) ("Indeed, it would be extremely odd to give [agency] decisions greater legal force in court than they have within the agency itself." (citation omitted)). In addition to precedential value, other indicators of a legislative-type decision include the agency "weighing conflicting policies, considering adversarial viewpoints," and using "a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of law." *Knox Creek*, 811 F.3d at 159 (citations and quotation marks omitted).

---

[13] Indeed, *Mead* noted that even precedential decisions may not always be *Chevron*-eligible. 533 U.S. at 232 ("[P]recedential value alone does not add up to *Chevron* entitlement.").

In this case, the right-of-way permit lacks virtually all of the procedural hallmarks of a legislative-type determination. First, the permit has no precedential value because it does not bind third-parties or otherwise set forth a general rule that controls future cases. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 648 (9th Cir. 2004) ("The Forest Service was not acting with the force of law in this case because it was granting permits, not acting in a way that would have precedential value for subsequent parties."). Instead, the permit is no more than an agreement between signatories. *See* J.A. 898, 909. Second, the NPS decision does not indicate that there was any adversarial or deliberative process where opposing views were presented or considered, nor does the decision address any opposing views. *See* J.A. 897–909; *cf. Doe v. Leavitt*, 552 F.3d 75, 81 (1st Cir. 2009) (giving deference to generally applicable interpretation that resulted from "structured" process that "allowed for written submissions by all affected parties"). Thus, an NPS right-of-way permit is no more formal than the ruling letters at issue in *Mead*, which classified products for purposes of imposing tariffs on specific parties without the use of notice-and-comment or any other "lawmaking pretense." *See* 533 U.S. at 232–34. We therefore conclude that the right-of-way permit here cannot be fairly characterized as "the exercise of a congressionally delegated legislative function." *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1067 (9th Cir. 2003) (en banc). Because it fails *Mead*'s second inquiry, the permit is not eligible for *Chevron* deference.

Having determined that NPS's interpretation of § 460a-8 is not entitled to *Chevron* review, we next consider whether it is entitled to a lesser form of deference under

47

*Skidmore*. "The weight of such a judgment . . . depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. Here, as explained above, NPS's invocation of § 460a-8 is a one-sentence recitation of statutory text without any accompanying explanation. And, because NPS makes no effort to specifically apply § 460a-8 to natural gas pipelines or to evaluate contrary arguments, its interpretation wholly lacks explanatory and persuasive power. We therefore accord it no *Skidmore* respect, and the agency's appellate counsel's *post hoc* interpretation of § 460a-8, like its interpretation of § 460a-3 and the Mineral Leasing Act, also warrants no deference. *See Knox Creek*, 811 F.3d at 159; *Fed. Subsistence Bd.*, 544 F.3d at 1095.

Accordingly, we interpret the relevant statutory provisions *de novo*.

2.

We first turn to the Mineral Leasing Act (MLA), codified at 30 U.S.C. § 185. The MLA authorizes the Interior Department to grant rights-of-way across "Federal lands" for oil or gas pipelines, provided that such pipelines satisfy an extensive list of conditions. *See* 30 U.S.C. § 185. The statute defines "Federal lands" as "all lands owned by the United States except lands in the National Park System."[14]  30 U.S.C. § 185(b). The question here is whether the MLA's omission of national parks precludes NPS from granting rights-of-way to oil and gas pipelines. For the reasons below, we conclude that

---

[14] The MLA's definitional provision contains two other exceptions not relevant to this case. *See* 30 U.S.C. § 185(b).

the MLA creates a separate scheme for regulating pipeline crossings on non-park lands and that it does not diminish NPS's authority to manage the National Park System.

Because the MLA does not authorize rights-of-way across national parks, Petitioners draw the negative implication that Congress has forbidden oil and gas pipelines from crossing the National Park System. For support, Petitioners cite to *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, where the Supreme Court held that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." 529 U.S. 120, 133 (2000).

However, *Brown & Williamson* is inapposite. There, the Supreme Court denied the Food and Drug Administration (FDA) the power to regulate tobacco because Congress had "enacted several statutes addressing the particular subject of tobacco and health, creating a distinct regulatory scheme for cigarettes and smokeless tobacco." *Id.* at 155–56. The FDA, by independently regulating tobacco, had effectively asserted authority in a field that other statutes had already occupied. Under such circumstances, the Supreme Court held that "Congress has directly spoken to the issue here and precluded the FDA's jurisdiction to regulate tobacco products." *Id.* at 133. Here, the MLA does not directly speak to the issue of oil and gas pipelines in national parks; the statute instead expressly applies to all Federal lands *except* national parks. Therefore, unlike the tobacco statutes in *Brown & Williamson* that occupied the FDA's regulatory space, the MLA is carefully drawn to *avoid* NPS's domain. Thus, the MLA and the National Park System simply operate in separate spheres, and the MLA leaves untouched

49

whatever preexisting right-of-way authority that Congress delegated for the Park System's management.

In an effort to show that the MLA is all-encompassing and precludes oil and gas pipelines in the National Park System, Petitioners cite the MLA's exclusivity and retroactivity provisions. 30 U.S.C. § 185(q), (t). However, those provisions do not support Petitioners' position because the provisions' scope remains limited to all "Federal lands" other than national parks. Had those provisions utilized a definition of "Federal lands" that included the National Park System, we may be compelled to agree, but that is not the statute we have.

Petitioners also argue that a ruling in the agency's favor would allow NPS and ACP to evade the policy choice that Congress made in the MLA, which subjects oil and gas pipelines to stringent requirements. However, the MLA's requirements, by the statute's plain text, never applied to the National Park System. Thus, there is simply nothing to evade. That is not to say that NPS has unbridled discretion to grant oil and gas rights-of-way—the agency still has to comply with the requirements of whatever authorizing statute it properly invokes. And, although the MLA does not preclude NPS from granting such rights-of-way, the statute's exhaustive requirements shed light on the rigor and thoroughness that Congress expects to accompany such weighty decisions, particularly given the National Park System's conservation mission. *See* 54 U.S.C. § 100101(a).

Accordingly, we hold that the MLA neither authorizes nor precludes grants of rights-of-way across "lands in the National Park System." 30 U.S.C. § 185(b).

50

3.

Having determined that the MLA leaves intact NPS's right-of-way authority, we now consider the scope of authority conferred by the Blue Ridge Parkway Organic Act and NPS's compliance with its requirements. At issue are two provisions containing substantially similar language, 16 U.S.C. § 460a-3 and § 460a-8. Petitioners argue that neither provision authorizes the right-of-way permit in this case, while NPS and ACP argue that both provisions are independently sufficient sources of authority. To harmonize and give effect to both provisions, we conclude below that § 460a-8 applies only to a specific extension of the Blue Ridge Parkway that is not at issue in this case. Even assuming that either § 460a-3 or § 460a-8 confers general authority on NPS to grant oil and gas rights-of-way through Blue Ridge Parkway property, we conclude that NPS has acted arbitrarily and capriciously by failing to explain why ACP's pipeline is not inconsistent with parkway purposes.

Our analysis begins with the text. Section 460a-3 provides that:

In the administration of the Blue Ridge Parkway, the Secretary of the Interior may issue revocable licenses or permits for rights-of-way over, across, and upon parkway lands, or for the use of parkway lands by the owners or lessees of adjacent lands, for such purposes and under such nondiscriminatory terms, regulations, and conditions as he may determine to be not inconsistent with the use of such lands for parkway purposes.

16 U.S.C. § 460a-3.

Section 460a-8 provides that:

The Secretary of the Interior may issue revocable licenses or permits for rights-of-way over, across, and upon parkway lands, or for the use of parkway lands by the owners or lessees of adjacent lands, or for such

51

purposes and under such terms and conditions as he may determine to be consistent with the use of such lands for parkway purposes.

16 U.S.C. § 460a-8.

To discern the scope of these two virtually identical provisions, we must determine how they interact with one another. NPS and ACP argue that § 460a-8 is broader than § 460a-3 because the former places an "or" in front of "for such purposes and under such terms and conditions as he may determine to be consistent with . . . parkway purposes." Thus, NPS and ACP read § 460a-8 as authorizing three types of permits: (1) permits for rights-of-way over, across, and upon parkway lands; (2) permits for the use of parkway lands by the owners or lessees of adjacent lands; and (3) permits for other purposes that the agency determines to be consistent with parkway objectives. Meanwhile, because § 460a-3 lacks the final disjunctive "or," it would only authorize two types of permits, both of which must be consistent with parkway purposes: (1) permits for rights-of-way over, across, and upon parkway lands and (2) permits for the use of parkway lands by the owners or lessees of adjacent lands.

We find NPS and ACP's reading of § 460a-8 unpersuasive. Were we to adopt it, § 460a-8 would completely swallow § 460a-3 and render it a nullity. Indeed, § 460a-8 would be an implied repeal of § 460a-3 because it would remove the consistency requirement that previously constrained NPS's discretion. This construction also flouts a fundamental principle that undergirds every aspect of NPS's management of the National Park System—the agency is forbidden from taking any action that is not consistent with its conservation mission unless Congress has "directly and specifically" authorized the

52

harmful activity. *See* 54 U.S.C. § 100101(a), (b)(2). As the Supreme Court has held, courts disfavor implied repeals and amendments of statutes. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 664 & n.8 (2007). Similarly, we have an obligation to read statutory provisions in context and to avoid rendering superfluous any parts thereof. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Accordingly, as long as there is a reasonable alternative, we will not read § 460a-8 as impliedly abrogating NPS's conservation mandate under § 460a-3 and 54 U.S.C. § 100101.[15]

Petitioners have provided a more than reasonable interpretation of § 460a-8 that also gives effect to § 460a-3. Petitioners correctly point out that § 460a-8 was a later-enacted provision passed within a larger bill authorizing the construction and management of an extension of the Blue Ridge Parkway, which would run from North Carolina into Georgia. *See* Pub. L. No. 90-555, § 3, 82 Stat. 967 (1968). The geographical distinction between § 460a-3 and § 460a-8 completely resolves the seeming redundancy of the two similarly worded provisions. In particular, the statutory provision explicitly relied on in the permit, § 460a-8, applies only to the never-constructed southern extension, not to the original Blue Ridge Parkway itself (for which § 460a-3 governs). In sum, because the proposed pipeline crossing in this case is in Virginia, § 460a-8 does not provide NPS with any authority to issue the requisite right-of-way permit.

---

[15] We note that even NPS's permit decision indicated that it only had authority under § 460a-8 to grant a right-of-way if it determined that such a grant is consistent with parkway purposes. J.A. 897. Therefore, NPS's litigation position is actually contrary to the agency decision that it purports to defend.

Ordinarily, that conclusion would end our inquiry because it is a "fundamental rule of administrative law" that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *See Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Under *Chenery*, "[i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id.* However, we are faced with an unusual circumstance in which NPS has invoked an inapplicable statutory provision, § 460a-8, but in doing so, has essentially recited the applicable text of another, § 460a-3.[16] As a result, affirming NPS's decision on § 460a-3 grounds would not substitute the Court's judgment for the agency's because the grounds for invoking § 460a-3 and § 460a-8 are the same. Under both § 460a-3 and § 460a-8, NPS's ground for granting a right-of-way permit is the identical determination that such a grant would not be inconsistent with parkway purposes. Accordingly, we conclude that *Chenery* alone does not compel a reversal and that we may affirm if § 460a-3 provides NPS with the requisite authority and NPS has complied with its requirements.

---

[16] *Compare* J.A. 897 ("§ 460a-8 authorizes the Secretary of the Interior to grant revocable licenses or permits for rights-of-way over, across, and upon Parkway lands, under such terms and conditions as he may determine to be consistent with the use of such lands for parkway purposes.") *with* 16 U.S.C. § 460a-3 ("[T]he Secretary of the Interior may issue revocable licenses or permits for rights-of-way over, across, and upon parkway lands . . . under such nondiscriminatory terms, regulations, and conditions as he may determine to be not inconsistent with the use of such lands for parkway purposes.").

54

As to NPS's authority under § 460a-3, the parties dispute two possible limitations. First, Petitioners argue that § 460a-3 authorizes the grant of rights-of-way only to "owners or lessees of adjacent lands." *See* 16 U.S.C. § 460a-3. NPS and ACP counter that the "owners or lessees" clause only modifies "for the use of parkway lands." In other words, they believe that NPS may authorize only the Parkway's neighbors to "use" the Parkway, but NPS can grant rights-of-way to both neighbors and non-neighbors. Second, the parties dispute whether § 460a-3 allows NPS to grant rights-of-way for oil and gas pipelines notwithstanding the neighbors clause. Petitioners argue that oil and gas pipelines are categorically inconsistent with parkway purposes and that NPS therefore has no authority to grant a right-of-way for any oil or gas pipeline, not just the ACP. The MLA (30 U.S.C. § 185) and 54 U.S.C. § 100902 may also inform our analysis of § 460a-3, because both statutes authorize rights-of-way for gas and utility-type purposes subject to detailed requirements rather than open-ended agency discretion. However, we need not—and thus do not—decide either of these broader interpretative questions because, even assuming that § 460a-3's general right-of-way authority encompasses oil and gas pipelines, Petitioners nonetheless prevail because the agency has not fulfilled the requirements needed to exercise any such authority.

To the extent § 460a-3 confers such authority, before NPS can properly issue a right-of-way permit, it must make a threshold determination that granting the right-of-way is "not inconsistent with the use of such lands for parkway purposes" and the overall National Park System to which it belongs. Critically, Congress has defined the National Park System's "purpose" as "conserv[ing] the scenery, natural and historic objects, and

55

wild life in the System units and [] provid[ing] for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a); *United States v. Stephenson*, 29 F.3d 162, 165 (4th Cir. 1994) (construing predecessor to 54 U.S.C. § 100101). Thus, unlike other Federal lands, such as the national forests, the National Park System's sole mission is conservation. *Mich. United Conservation Clubs v. Lujan*, 949 F.2d 202, 207 (6th Cir. 1991) ("[U]nlike national forests, Congress did not regard the National Park System to be compatible with consumptive uses."). To that end, Congress has mandated that the management of the National Park System, including the authorization of activities therein, be consistent with those conservation values and purposes, absent specific and direct legislation to the contrary. 54 U.S.C. § 100101(b). That conservation mandate extends to the management of the Blue Ridge Parkway, a unit of the National Park System. 16 U.S.C. § 460a-2. Thus, absent a specific exemption from this mandate, NPS must determine that its right-of-way permit is not in "derogation" of the National Park System's conservation mission. 54 U.S.C. § 100101(b).

The Blue Ridge Parkway also has its own conservation and preservation purpose, according to NPS's General Management Plan for the Parkway. Under the Plan, the Parkway's specific purposes are to "connect . . . national parks by way of a 'national rural parkway'—a destination and recreational road that passes through a variety of scenic ridge, mountainside, and pastoral farm landscapes"; "conserve the scenery and preserve the natural and cultural resources of the parkway's designed and natural areas"; "provide

56

for public enjoyment and understanding of the natural resources and cultural heritage of the central and southern Appalachian Mountains"; and "provide opportunities for high-quality scenic and recreational experiences along the parkway and in the corridor through which it passes."[17]  The Blue Ridge Parkway Organic Act then forbids NPS from authorizing any right-of-way that is not consistent with those parkway purposes. *See* 16 U.S.C. §§ 460a-3, 460a-8.  Thus, the right-of-way permit in this case would violate statutory requirements if not accompanied by a valid agency determination that the pipeline is not inconsistent with the Parkway's scenic value and the public's enjoyment thereof.

We review NPS's factbound determination that the pipeline right-of-way is consistent with the purposes of the Parkway and the Park System under the deferential "arbitrary and capricious" standard set forth in *State Farm*.  *See* 463 U.S. at 43; *see also* 5 U.S.C. § 706.  Under *State Farm*, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Generally, an agency decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

---

[17] National Park Service, Blue Ridge Management Plan, 9 (Jan. 2013), https://parkplanning.nps.gov/document.cfm?parkID=355&projectID=10419&documentID=51305 (saved as ECF opinion attachment 4).

57

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Here, the agency decision is not accompanied by any explanation, let alone a satisfactory one. Instead, the permit merely recites that "NPS has determined that the proposed use or occupancy of the NPS-administered lands or waters described herein for the operation and maintenance of the Project, is consistent with the use of these lands for Parkway purposes" and provides no further elaboration. J.A. 897.

We find this lack of explanation particularly troubling given the evidence in the record indicating that the presence of the pipeline is inconsistent with and in derogation of the purposes of the Parkway and the Park System. Indeed, a visual impact study that NPS oversaw specifically concluded that the effect of the pipeline on views from the Parkway "would likely be inconsistent with NPS management objectives." J.A. 1020. The permit neither mentions this detrimental effect nor the efficacy of any mitigating steps. *See, e.g., Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*, 865 F.3d 630, 638 (D.C. Cir. 2017) (finding agency action was arbitrary and capricious when "it evidences a complete failure to reasonably reflect upon the information contained in the record and grapple with contrary evidence—disregarding entirely the need for reasoned decisionmaking").

Nor does the NPS decision address whether the drilling required to install the pipeline will remain consistent with park purposes should the proposed drilling method fail. In the event of failure, ACP must resort to its contingency plan of using the "direct pipe" method, which is expected to intensify the disruptive effects of the pipeline and

impact additional observation areas.  J.A. 560.  Similarly, the permit, at numerous points, appears to acknowledge the possibility of spills and fires, but it does not consider whether inviting such risks into the National Park System is consistent with NPS's conservation mission.  *See, e.g.*, J.A. 903 (requiring ACP to provide contact information in case of spills and fires).  Because NPS's permit decision contains no explanation of likely inconsistencies that NPS's own review has uncovered, we must conclude that the agency has failed to draw a "rational connection between the facts found and the choice made" and has ignored important aspects of the problem.  *See State Farm*, 463 U.S. at 43; *Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006) (holding that agency acted arbitrarily by weakening environmental protection standards without explaining consistency with statutory objectives).  To do less would be to accept an agency's blanket conclusions at face-value and to abdicate this Court's role to ensure that the agency has considered "important aspect[s] of the problem" and rendered a decision that is at least rational.  *See State Farm*, 463 U.S. at 43; *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 471–72 (4th Cir. 2013).

Compounding these omissions are elemental errors in what NPS does say.  In addition to invoking an inapplicable statutory provision (16 U.S.C. § 460a-8) as the source of its authority, the NPS decision also cites an inapplicable set of regulations.  In the permit, NPS seems to take as a given that regulations codified at 36 C.F.R. Part 14 govern the issuance of the ACP permit and its conditions.  J.A. 897.  However, those regulations were promulgated under what is now 54 U.S.C. § 100902, a statute that expressly governs rights-of-way for electric utilities, telecommunications lines, and water

59

conduits—not gas pipelines. While NPS certainly has discretion under 16 U.S.C. § 460a-3 to adopt those same requirements for other uses, there is nothing to indicate that NPS recognized the actual scope of 36 C.F.R. Part 14 or considered the regulations' appropriate application beyond the express purposes of § 100902. Given the collective weight of these errors and omissions, we are left with the firm conviction that NPS has not discharged its statutory obligation to apply its considered expertise to the exercise of its delegated authority.

Accordingly, we hold that NPS's permit decision is arbitrary and capricious. NPS began by invoking inapplicable laws. Even if this Court overlooks that error and assumes that NPS correctly interpreted the Organic Act to authorize rights-of-way for gas pipelines, NPS has not fulfilled its statutory mandate of ensuring consistency with values and purposes of the Blue Ridge Parkway unit and the overall National Park System.

\*      \*      \*

In sum, we hold that Petitioners have standing to bring this challenge, that this Court owes no deference to the statutory interpretation contained in NPS's permit decision, that the MLA does not strip NPS of authority to grant rights-of-way for gas pipelines, and that NPS's decision to grant ACP a right-of-way was arbitrary and capricious for failing to explain the pipeline's consistency with the purposes of the Blue Ridge Parkway and the National Park System.

IV.

Having concluded that both FWS and NPS erred in issuing their respective authorizations, we turn to the final question of remedy. Respondents argue that this Court lacks authority to vacate the agency actions under the Natural Gas Act. However, Respondents' position is contrary to the plain text of the Natural Gas Act. The judicial review provision at issue provides,

> If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court.

15 U.S.C. § 717r(d)(3).

On its face, § 717r(d)(3) only applies to an agency action that "would prevent the construction" of the natural gas facility. *See Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 150 (2d Cir. 2008). Here, the agency decisions do the opposite by enabling pipeline construction, and the provision is therefore inapplicable. As Petitioners correctly argue, § 717r(d) allows entities seeking approval of a pipeline to obtain more efficient resolution when an agency denies their application. *See Dominion Transmission*, 723 F.3d at 241 ("Congress provided for expedited judicial review of federal or state agency action or inaction that deprives a company building a FERC-certified natural gas facility of an authorization it requires to proceed with construction.") (citing 15 U.S.C. § 717r(d)). Accordingly, in this case, the Natural Gas Act's judicial review provision does not modify the APA's default rule, which empowers this Court to "hold unlawful and set aside agency action." *See* 5 U.S.C. § 706(2)(A).

61

Because FWS and NPS have both granted authorizations in contravention of their respective statutory requirements, we conclude that the correct remedy is to vacate the ITS and the right-of-way permit, respectively.

V.

For the reasons in Parts II and IV, we previously vacated the ITS pending the issuance of this opinion. *Sierra Club*, 722 F. App'x at 322.

For the reasons in Parts III and IV, we now VACATE the right-of-way permit that NPS issued to ACP.

*IT IS SO ORDERED.*